**KUWAIT AIRWAYS CORPORATION, Appellant,**

v.

**AMERICAN SECURITY BANK, N.A. and First American Bank, N.A., Appellees.**

Nos. 88–7039, 88–7040, 88–7055, 88–7056 and 89–7010.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 8, 1989.

Decided Dec. 1, 1989.

Order on Petition for Rehearing Jan. 10, 1990.

Thomas J. Whalen, with whom Robert P. Silverberg and Robert W. Ludwig, Jr., Van Nuys, Cal., were on the brief, for appellant.

Dale A. Cooter and Joseph M. Cahill, with whom Nicholas H. Hantzes, Washington, D.C., was on the brief, for appellees.

Before MIKVA, EDWARDS and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

This case involves a suit by Kuwait Airways Corporation ("Kuwait") against American Security Bank ("ASB"), the *depositary bank,* and First American Bank ("FAB"), the *drawee bank.* During the course of an extended jury trial, Kuwait sought to prove that the depositary bank

converted funds and breached a contract by opening a corporate account upon the request of a Kuwait employee, Robert Sensi, without any documentation and by taking for deposit into this account checks amounting to approximately $2.5 million on missing or forged indorsements. Kuwait also sought to prove that the drawee bank converted approximately $2.5 million by processing and paying checks from ASB that had been deposited by Sensi without payee indorsements or some other form of authorized indorsement. The jury returned a verdict for Kuwait against ASB (the depositary bank) in the amount of $766,-777.66; the jury rejected Kuwait's claim against FAB, thus returning a verdict of no damages against the drawee bank. The District Court then entered judgment in accordance with the jury's verdicts.

Kuwait now seeks reversal and remand of the District Court judgment. *See Kuwait Airways Corp. v. American Sec. Bank*, Civ. Action No. 86–2542, 1987 WL 33448 (D.D.C. Dec. 23, 1987), *reprinted in* Joint Appendix ("J.A.") 75. Kuwait asks this court to enter judgment in its favor against ASB in the amount of approximately $2.5 million for breach of contract and conversion of funds, and against FAB in the amount of approximately $2.5 million for conversion of funds for payment of checks on "unauthorized" indorsements. Kuwait further seeks an award of prejudgment interest from the date of conversion of each check by each bank. Finally, Kuwait requests remand for a new trial solely on the issue of punitive damages against American Security Bank.[1] In advancing these claims, Kuwait asserts that the District Court erred in: (1) not holding ASB liable as a matter of law pursuant to D.C. Code § 28:3–419 (1981) for the face amount of the checks converted; (2) not holding FAB absolutely liable for the face amount of the checks converted; (3) not awarding prejudgment interest pursuant to D.C.Code § 15–108 or 15–109 (1981); and (4) dismissing Kuwait's claim for punitive damages against ASB.

American Security Bank, the defendant-appellee and cross-appellant, requests this court to vacate the jury verdict and enter judgment in its favor on the ground that Kuwait ratified the account opened by Sensi. Alternatively, ASB seeks a new trial on the grounds that: (1) the District Court failed to instruct the jury on the statute of limitations issue; (2) Kuwait's contract claim should not have been submitted to the jury; and (3) newly discovered evidence exonerates ASB from liability.

On the judgment against ASB, we conclude that, because the District Court should not have applied the "discovery rule" to this case, a significant portion of Kuwait's suit is barred by the statute of limitations. The jury returned a general verdict, so we cannot determine the portion of the award that relates to barred claims. Thus, we must reverse and remand for a new trial covering those periods not barred by the statute of limitations. We find no merit in any of the other claims advanced by ASB; and we find no merit in Kuwait's claims seeking a directed verdict or judgment notwithstanding the verdict against ASB. If on remand the District Court is again presented with the question of whether to award prejudgment interest, the matter should be determined pursuant to the standards enunciated in *Duggan v. Keto*, 554 A.2d 1126 (D.C.1989). On the judgment in favor of FAB, we find no error and affirm.

## I. BACKGROUND

The material facts of this case are undisputed. In 1976, Kuwait opened a corporate account with ASB in the District of Columbia, for which the bank required documentation from the Board of Directors of Kuwait authorizing the establishment of the account and designating persons authorized to withdraw funds from the account. ASB established the corporate account, herein referred to as the "826 Account," in Kuwait's name upon receipt of the documentation.

---

**1.** The District Court dismissed the punitive damages claim. *See Kuwait Airways Corp. v. Ameri-* can Sec. Bank, Civ. Action No. 86–2542, slip op. at 25 (D.D.C. Oct. 22, 1987), *reprinted in* J.A. 43.

Kuwait's Chairman, members of the Board and certain key members of management in the home country were the only persons authorized to withdraw funds from the 826 Account. It is uncontested that this account was a "depositary account" into which funds were to be deposited locally; it was not a checking account upon which funds could be drawn by any Kuwait employee in Washington or New York.

In 1977, Kuwait hired Robert Sensi as area sales manager for the District of Columbia. Sensi had a broad range of authority in managing the sales office including regular contact with ASB regarding the Kuwait 826 Account. On November 25, 1980, at Sensi's request and on the basis of Sensi's signature alone, ASB opened a corporate checking account (the "640 Account") in the name of Kuwait, and issued checks permitting withdrawal of funds on Sensi's signature alone. In disregard of the bank's own procedures, ASB opened the account without any documentation from Kuwait that the airline authorized the opening of the account or the withdrawal of funds from the account.

During the period from the opening of the 640 Account in November of 1980 through August of 1986, Sensi and his subordinates made deposits of checks payable to Kuwait into both the 826 Account and the 640 Account. Deposits into the 640 Account amounted to a total of $2,654,-232.64. Out of the 523 checks deposited in the 640 Account, all but five were drawn by the Embassy of Kuwait in Washington, D.C. The Embassy checks deposited into the 640 Account represented approximately ten percent of Kuwait's total sales to the Embassy for the period. Accordingly, Kuwait records showed that the Embassy of Kuwait carried a substantial and long past due outstanding balance to the airline. The New York Kuwait office, which was responsible for the accounting functions of the region, relied upon the Washington office to collect the outstanding balances from the Embassy. Representatives of the New York office visited with Embassy offi-

cials regarding the substantial outstanding balance on only two or three occasions over the six-year period. The deposits into the 640 Account stopped in August of 1986 when the Embassy produced cancelled checks as proof to Kuwait of payment of old airline invoices.

ASB accepted over ninety percent of the checks deposited into the 640 Account on missing payee indorsements. FAB, the Embassy of Kuwait's bank (the "drawee bank" in the instant case), processed these checks for collection and payment on ASB's line indorsement only.[2] The remaining ten percent of the checks contained some form of incomplete or unauthorized indorsement, such as: "for deposit only" (with or without the account number); or a bank-supplied payee indorsement "For deposit only to within named payee"; or "Deposit to the Credit of the Within Named Payee Absence of Endorsement Guaranteed American Security Bank, N.A. Washington, D.C."; or with the payee stamp indorsement "For Deposit Only, Kuwait Airways Account 21–862–93–826," the number of the *826* Account.

Sensi wrote numerous checks from the 640 Account payable to family members, friends, business associates, business ventures, investments and political organizations. He also wrote checks from the 640 Account to "cash" in amounts ranging from $5,000 to $25,000 and deposited these checks into his personal account. When Kuwait pressured Sensi to collect the outstanding amounts from the Kuwait Embassy, he transferred funds from the 640 Account to the 826 Account to cover the oldest outstanding invoices, in an amount totaling $141,060.56.

Kuwait inquired about their account balances around the world every year for audit purposes. In 1983, ASB responded to the audit inquiry stating that it could find no account of Kuwait Airways Corporation. When the Kuwait Chairman referred ASB to the 826 Account, ASB confirmed the account by telex and a letter which re-

---

**2.** A "line indorsement," as the District Court noted, is a "one-line computer stamp affixed to the reverse side of every check handled by ASB. The indorsement identifies ASB and the account

for which the check was processed." *Kuwait Airways Corp. v. American Sec. Bank,* Civ. Action No. 86–2542, slip op. at 8 n. 3 (D.D.C. Dec. 23, 1987), *reprinted in* J.A. 82 n. 3.

ferred to the balance of the 826 Account, but did not mention the 640 Account. In 1984, ASB sent to Kuwait's outside auditors in the home country a form listing account numbers and balances for *both* accounts. The auditors apparently deemed the information pertaining to the accounts immaterial to their audit, but they passed along the information to Kuwait. Upon receiving this information, Kuwait's head office sent a telex to the New York office on October 31, 1984, requesting that they investigate the 640 Account. Several months later, when Kuwait's New York office failed to respond, the Kuwait home office sent a follow-up telex. There is no evidence of any further follow-up on the telexes.

In 1985, ASB ignored Kuwait's instruction to mail audit information directly to Kuwait's auditors. Instead, ASB gave the requested information to Sensi, who then altered the response (which had identified both accounts) to list only the 826 Account. Sensi sent this altered document on to Kuwait's home office. In 1986, Kuwait's Director of the Finance Department sent a letter to ASB asking them to "please send direct to our auditors at your earliest convenience either to the above address [in Kuwait], or by telex to [a Kuwait number], confirmation of all our balances in your books ... as follows: 1. Balances of all current accounts; 2. Balances of all deposit accounts; 3. Balances of all other accounts...." Letter from Ali Humood Al Ali, Director Finance Dept. Kuwait Airways Corp., to American Security Bank (June 15, 1986), *reprinted in* J.A. 204. In its response, ASB identified only the 826 Account and stated that "[t]his is the only account relationship we have with Kuwait Airways." [3] ASB gave its written response to Sensi's secretary and did not mail it to Kuwait's auditors.

Over the six-year period, a total of $2,654,232.64 was deposited into the 640 Account; of this, $141,060.56 was paid

from the 640 into the 826 Account. Kuwait claims the banks converted the remaining $2,513,172.08. Approximately $1,800,000 of this total amount was deposited into the account after the 1984 account verification form was received by Kuwait's auditors in the home country.

## II. ANALYSIS

### A. *Governing Law*

As an initial matter, it is uncontroverted that District of Columbia law applies in this diversity case. Furthermore, there is no question that this court must look to local law for the applicable statute of limitations. *See Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1489 (D.C.Cir.1989); *Hull v. Eaton Corp.*, 825 F.2d 448, 456 (D.C.Cir.1987) (per curiam); *Hoffa v. Fitzsimmons*, 673 F.2d 1345, 1360 n. 41 (D.C.Cir.1982).

### B. *The "Discovery Rule"*

■ A three-year statute of limitations applies to the instant case. *See* D.C.CODE ANN. § 12–301 (1981); *Ehrenhaft v. Malcolm Price, Inc.*, 483 A.2d 1192, 1201 (D.C. 1984) (three-year statute of limitations for tort and contract claims); *Forte v. Goldstein*, 461 A.2d 469, 472 (D.C.1983) (per curiam) (three-year statute of limitations for conversion). The issue is whether the statute of limitations began to run when the checks payable to Kuwait were converted or when the plaintiff knew or reasonably should have known of the conversion.[4] The District Court applied the "discovery rule" in this case, thus tolling the statute of limitations, and allowing claims for checks converted more than three years prior to the date the plaintiff filed suit. *See Kuwait Airways Corp. v. American Sec. Bank*, Civ. Action No. 86–2542, slip op. at 14 (D.D.C. Dec. 23, 1987), *reprinted in* J.A. 88. We hold that the District Court erred on this point. The District of Colum-

---

3. Letter from Lewoner W. Winfield, ASB Assistant Manager, to Director Financing Dept., Kuwait Auditing Office (July 11, 1986), *reprinted in* J.A. 205.

4. Under the discovery rule, "a particular cause of action accrues 'when the plaintiff knows or through the exercise of due diligence should have known of the injury.'" *Ehrenhaft*, 483 A.2d at 1201 (quoting *Burns v. Bell*, 409 A.2d 614, 617 (D.C.1979)).

bia courts and this court, following local law, have heretofore applied the discovery rule to cases involving medical malpractice,[5] latent diseases,[6] legal malpractice,[7] breach of contract and warranty for deficient design and construction [8] and, under a related exception, in cases involving fraudulent concealment or misrepresentation.[9] However, this court has declined to apply the discovery rule in a breach-of-warranty product liability case. *See Hull,* 825 F.2d at 456–57. In this case, we conclude that the commercial circumstances presented do not call for application of the discovery rule. Thus, it appears that all claims for checks deposited into the 640 Account more than three years prior to the filing date of the initial complaint are barred. *Cf. Riddell,* 866 F.2d at 1489 (date plaintiff filed action is relevant date for determining timeliness of action); *Varela v. Hi–Lo Powered Stirrups, Inc.,* 424 A.2d 61, 69–70 (D.C.1980) (same).

The District of Columbia Court of Appeals has articulated four factors for a court to consider in determining whether the discovery rule should apply: (1) the justifiable reliance of a plaintiff on the professional skills of those hired to perform their work; (2) the latency of the deficiency; (3) the balance between the plaintiff's interest in having the protection of the law and the possible prejudice to the defendant; and (4) the interest in judicial economy. *See Woodruff v. McConkey,* 524 A.2d 722, 727–28 (D.C.1987) (discovery rule not applicable to home improvement contractor's failure to obtain license).

In this case, each of these factors militates against application of the discovery rule. With regard to the factor of reliance, the District of Columbia Court of Appeals has indicated that the ability of an ordinary person to detect the violation "is critical to this threshold question" of whether the discovery rule applies. *Id.* at 727. There can be no question in the instant case that an ordinary business could have detected the siphoning off of funds within a three-year period of their conversion, without hiring another professional. Although it may be that customers should be able to rely on banks to act in a reasonable manner, as the District Court noted,[10] the issue of the parties' duties to one another goes to the merits in a case where the discovery rule applies, and not to "the prior question whether it should apply." *See Woodruff,* 524 A.2d at 727.

The second factor is the latency of the injury. The District of Columbia courts usually have applied the discovery rule where "the actual injury manifests itself only years after the negligent act." *Id.* As the District of Columbia Court of Appeals has stated on more than one occasion, "the discovery rule 'emerged to redress situations in which the fact of injury was not readily apparent and indeed might not become apparent for several years after the incident causing injury had occurred.' " *Stager v. Schneider,* 494 A.2d 1307, 1316 (D.C.1985) (quoting *Ehrenhaft,* 483 A.2d at 1201). Unlike many medical or legal malpractice cases and latent-disease cases in which the injury is not manifested until long after the unlawful act, *see, e.g., Burke v. Washington Hosp. Center,* 293 F.Supp. 1328 (D.D.C.1968), the injury to the payee in a conversion case manifests itself at the

**5.** *See, e.g., Bussineau v. President & Directors,* 518 A.2d 423 (D.C.1986); *Burns v. Bell,* 409 A.2d 614 (D.C.1979); *Burke v. Washington Hospital Center,* 293 F.Supp. 1328, 1333–34 (D.D.C.1968).

**6.** *See, e.g., Wilson v. Johns–Manville Sales Corp.,* 684 F.2d 111, 116–17 (D.C.Cir.1982).

**7.** *See, e.g., Duggan v. Keto,* 554 A.2d 1126, 1144 (D.C.1989); *Knight v. Furlow,* 553 A.2d 1232, 1236 (D.C.1989) (applying discovery rule, but determining that because plaintiff knew of, and sustained injury from defendant's alleged malpractice more than three years before filing complaint, statute of limitations barred plaintiff's prosecution of malpractice claims); *Byers v. Burleson,* 713 F.2d 856, 859–60 (D.C.Cir.1983).

**8.** *See Ehrenhaft v. Malcolm Price, Inc.,* 483 A.2d 1192 (D.C.1984).

**9.** *See, e.g., William J. Davis, Inc. v. Young,* 412 A.2d 1187, 1192 (D.C.1980) (tolling statute of limitations where employer fraudulently concealed factual basis of employee's action for unpaid minimum wages); *Keener v. Walker,* 256 A.2d 779 (D.C.1969) (tolling statute of limitations where defendant obtained medical benefits through misrepresentation).

**10.** *See Kuwait Airways Corp. v. American Sec. Bank,* Civ. Action No. 86–2542, slip op. at 14 (D.D.C. Dec. 23, 1987), *reprinted in* J.A. 88.

time the wrongful act occurs—that is, when the forger deposits or cashes the check. Thus, the *injury* in the instant case is not latent.

We further find that the balance of interests weighs in favor of the defendant. Another court that has directly addressed the question of whether to apply the discovery rule in a conversion action for a forged indorsement offered the following rationale for its decision not to invoke the discovery rule:

> analysis of the underlying policies leads us to conclude that a payee's action for conversion of a check must be governed by the general rule that in the absence of fraud by those invoking the statute of limitations, a cause of action in conversion accrues at the time the defendant wrongly exercises dominion, regardless of the plaintiff's ignorance. The finality of transactions promoted by an ascertainable definite period of liability is essential to the free negotiability of instruments on which commercial welfare so heavily depends....
>
> In choosing the date of the wrongful exercise of dominion as the point from which the period of limitation runs, the law of conversion presumes that property owners know what and where their assets are, despite the fact that the presumption may work a hardship upon the property owner who fails to discover his or her ownership rights until after the period has run.

*Fuscellaro v. Industrial Nat'l Corp.*, 117 R.I. 558, 368 A.2d 1227, 1231 (1977). We find this reasoning persuasive.

Finally, judicial economy militates against application of the discovery rule "because of the court's preference to adjudicate more timely complaints." *Woodruff*, 524 A.2d at 728. Several other courts that have addressed the issue of whether the discovery rule should be applied to a conversion claim have similarly concluded that it should not. *See, e.g., Lumber Village, Inc. v. Siegler*, 135 Mich.App. 685, 355 N.W.2d 654, 657–58 (1984) (declining to apply discovery rule where payee's indorse-

ment forged by copayee); *Southwest Bank & Trust Co. v. Bankers Commercial Life Ins. Co.*, 563 S.W.2d 329, 331–32 (Tex.Civ. App.1978) (declining to apply discovery rule in commercial paper context, reasoning that nothing in bank's "act of conversion rendered the act or the resulting injury difficult to discover" and that, instead, the discovery problems stemmed from fraudulent concealment by the indorsement forger); *People of the State of Michigan for Use and Benefit of the Michigan Pub. School Employees Retirement Sys. v. Michigan Nat'l Bank*, 20 Mich.App. 22, 173 N.W.2d 762, 766–67 (1969) (determining that forged indorsements for deceased's retirement benefits accrued when items were paid, not when forgeries were discovered); *Chemical Workers Basic Union, Local No. 1744 v. Arnold Sav. Bank*, 411 S.W.2d 159, 164–65 (Mo.1966) (*en banc*) (declining to invoke exception to statute of limitations where defendant depositary bank cashed check for third party on forged indorsement of check made out to plaintiff union); *see also Adrian v. American Sec. & Trust Co.*, 211 A.2d 771 (D.C.1965) (prior to application of U.C.C. or development of discovery rule exception, determining statute of limitations began running at time bank takes check on missing indorsement). *But see, e.g., Branford State Bank v. Hackney Tractor Co.*, 455 So.2d 541, 542 (Fla.Dist. Ct.App.1984) (*per curiam*). In *Southwest Bank & Trust Co.*, the court reasoned that

> [s]ince no discovery problems are inherent ... we hold that the "discovery rule" does not apply to toll the statute of limitations where a bank is sued for conversion on a forged endorsement. In such cases, limitations can only be tolled by proof of the bank's fraudulent concealment of the transaction.

563 S.W.2d at 332.

■ We recognize, as this court did in declining to apply the discovery rule in a products liability case, that the District of Columbia "may decide in the future to extend the discovery rule to a claim of this sort," *Hull*, 825 F.2d at 457; but "as of today the rule does not reach so far," *id.* And application of the standard articulated in *Woodruff* leads us to conclude that the

District of Columbia, if presented with this case, would not so extend it.[11]

Although we hold that, as a general matter, the discovery rule should not apply to a case of this sort, there is a possible question of "fraudulent concealment," *see Southwest Bank & Trust Co.*, 563 S.W.2d at 332, which might toll the statute of limitations in this case. For example, in 1985, and again in 1986, ASB ignored Kuwait's instruction to mail audit information directly to Kuwait's auditors. Instead, the requested information (including information regarding the 640 Account) was sent to Sensi. It is arguably possible for Kuwait to claim that these actions by ASB resulted in "fraudulent concealment" so as to toll the statute of limitations during the period of such concealment. The parties have not addressed this issue on appeal, and the matter was not submitted to the jury at the conclusion of the first trial, so we offer no view on the applicability of the fraudulent concealment exception in this case. However, we note that this may be a matter for jury consideration in any retrial of this case.

### C. First American Bank's Liability

We uphold the jury's verdict awarding no damages to Kuwait Airways Corporation from First American Bank. Kuwait claims that First American Bank is absolutely liable in conversion under D.C.Code § 28:3-419(2) and that a defense of contrib-

utory negligence, pursuant to D.C.Code § 28:3-406 (1981), is not available to FAB. *See* Brief of Appellant at 21-29. We reject this argument.

■ As an initial matter, there is no merit to Kuwait's contention that section 3-406 does not provide a defense to section 3-419 conversion claims. *See, e.g., American Sec. Bank v. American Motorists Ins. Co.*, 538 A.2d 736, 738 (D.C.1988) ("[D]rawer's negligence that contributes to a forgery negates the drawee bank's liability, but only if the drawee bank meets its burden of proving by a preponderance of the evidence that it complied with reasonable commercial standards when it cashed the check."); *American Mach. Tool Distribs. Ass'n v. National Permanent Fed. Sav. & Loan Ass'n*, 464 A.2d 907, 912 (D.C.1983) (discussing application of section 3-406 to conversion claim). *See generally* J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE §§ 16-4, 16-7 (3d ed. 1988).

Kuwait further contends that section 3-406 does not apply where the payee's indorsement is missing. However, where, as in this case, we assume that the absence of any indorsement is a "forged indorsement" within the meaning of section 3-419(1)(c), we must apply a similar reading to the term "unauthorized signature" in section 3-406.[12] *Cf. Empire Moving & Warehouse Corp. v. Hyde Park Bank & Trust*

---

**11.** Furthermore, it is clear that even if the discovery rule were to apply to this case, the District Court erred in failing to submit to the jury the question of when Kuwait knew or reasonably should have known of the forged indorsements. The point in time at which the plaintiff knew or should have known of an injury is a question of fact for the jury, *see, e.g., Byers v. Burleson*, 713 F.2d 856, 861 (D.C.Cir.1983), and the trial judge may make this determination as a matter of law only if no reasonable person could disagree on the date, *id.* The facts of this case do not offer such clarity.

**12.** While we acknowledge that this court previously determined that the absence of one of two necessary signatures does not constitute an "unauthorized signature" within the meaning of U.C.C. § 4-406, *see G & R Corp. v. American Sec. & Trust Co.*, 523 F.2d 1164, 1169 (D.C.Cir. 1975), the court there also determined that the U.C.C. did not cover the precise situation involved in the case—checks lacking one of two required *signatures* of the drawer (not indorsements) and disbursement of loan advances con-

trary to the loan agreement, *see id.* at 1171. Thus, the court treated the case as a contract action. *See id.* By contrast, the present case involves a conversion action brought under the U.C.C. and a negligence defense also embraced by the U.C.C.

In any event, the court in *G & R Corp.* was not interpreting the same section of the U.C.C. and did not face the precise issue that we decide today, and so the decision there is not dispositive of this case. Furthermore, since that opinion, there has been substantial authority rejecting the view announced in *G & R Corp. See, e.g., Southern Contract Carpet, Inc. v. County Nat'l Bank*, 528 So.2d 42, 43-44 (Fla.Dist.Ct.App. 1988); *First Nat'l Bank v. La Sara Grain Co.*, 646 S.W.2d 246, 251-52 (Tex.Ct.App.1982), *aff'd in part, rev'd in part*, 673 S.W.2d 558 (Tex.1984) (affirming interpretation of § 4-406); *Rascar, Inc. v. Bank of Oregon*, 87 Wis.2d 446, 275 N.W.2d 108, 111 & n. 1 (1978); *King of All Mfg., Inc. v. Genesee Merchants Bank & Trust Co.*, 69 Mich.App. 490, 245 N.W.2d 104 (1976); *Fireman's Fund Ins. Co. v. National Westminster Bank U.S.A.*, 543 N.Y.S.2d 604, 605-06 (N.Y.Sup.

*Co.*, 43 Ill.App.3d 991, 2 Ill.Dec. 753, 757, 357 N.E.2d 1196, 1200 (1976) (applying section 3–406 where bank took checks without required indorsements). In other words, the scope of the defense under section 3–406 is coextensive with the scope of the substantive offense defined by section 3–419(1)(c). It would make no sense to construe the statute otherwise.[13]

■ In this case, the jury apparently found that a section 3–406 defense was available to FAB because of its adherence to "reasonable commercial standards," and because of Kuwait's "negligence." There is no basis for us to overturn this judgment. Therefore, we decline to disturb the jury's verdict or the judgment of the District Court awarding no damages on Kuwait's claims against FAB.

D. *American Security Bank's Liability*

■ Under section 3–419(3), if ASB, the depository bank, acted "in accordance with the reasonable commercial standards applicable to the business," it is not liable in conversion "beyond the amount of any proceeds remaining in [its] hands." D.C.CODE ANN. § 28:3–419(3) (1981). Commercial reasonableness is a question of fact for the jury. It is not an issue to be decided as a matter of law, as Kuwait contends. *See* Brief of Appellant at 20–21.

Several courts, including the District of Columbia Court of Appeals, have determined that it is commercially unreasonable *as a matter of law* for a bank to take for deposit in an *individual* account a check made payable to a corporation, without first ascertaining the authority of the depositor/indorser. *See, e.g., American Mach. Tool Distribs. Ass'n v. National Permanent Fed. Sav. & Loan Ass'n*, 464 A.2d 907, 913–14, 915 (D.C.1983) (citing similar determinations in other jurisdictions). But aside from this one fairly widely recognized exception, whether a bank acted in a commercially reasonable manner

is usually a question of fact. *See, e.g., Hydroflo Corp. v. First Nat'l Bank*, 217 Neb. 20, 349 N.W.2d 615, 619 (1984); *cf. American Sec. Bank v. American Motorists Ins. Co.*, 538 A.2d 736, 739–41 (D.C. 1988) (upholding trial court's finding of fact that bank had not complied with reasonable commercial standards when it cashed a series of forged checks in which forged name misspelled). The District Court properly submitted this issue to the jury.

■ It is also clear that a depositary bank that has not acted in a commercially reasonable manner in taking checks over forged indorsements may have available to it the defenses of ratification and apparent authority. *See, e.g., Senate Motors, Inc. v. Industrial Bank*, 9 U.C.C.Rep.Serv. (Callaghan) 387, 390–92 (D.C.Sup.Ct.1971) (discussing defenses both of ratification and apparent authority). Thus, Kuwait's claim that, under D.C.Code § 28:3–419, American Security Bank is absolutely liable if it acted in a commercially unreasonable manner, *see* Brief of Appellant at 16–17, misapprehends the law. Indeed, the U.C.C. itself preserves the common law defenses:

> Unless displaced by the particular provisions of [the U.C.C.], the principles of law and equity, including ... the law relative to ... principal and agent, estoppel ... or other validating or invalidating cause shall supplement its provisions.

D.C.CODE ANN. § 28:1–103 (1981). *See also id.* § 28:3–404 (ratification); *id.* § 28:1–201(43) (apparent authority); J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE § 13–3 (3d ed. 1988).

■ Given the verdict in this case, it appears that the jury found that, after notification from ASB to Kuwait in 1984 of the existence of the 640 Account, Sensi's conduct was clothed with *apparent authority*. ASB contends, however, that the District Court erred in denying ASB's mo-

---

Ct.1988); *Provident Sav. Bank v. United Jersey Bank*, 207 N.J.Super. 303, 504 A.2d 135, 140–41 (1985). *But see, Wolfe v. University Nat'l Bank*, 270 Md. 70, 310 A.2d 558, 560 (1973). If faced with this question now, we are convinced that the District of Columbia Court of Appeals would adhere to the construction of the statute enunciated by these courts.

**13.** Because of our holding on § 3–406, we need not consider whether, when FAB processed and paid checks from ASB on the line indorsements of the depository bank, the drawee bank was acting on valid indorsements under D.C.Code § 28:4–205 (1981).

tion for judgment n.o.v. on the issue of *ratification.* In other words, ASB asserts that Kuwait *ratified* Sensi's actions and this had a retroactive and prospective effect of relieving ASB of all liability. We reject this claim.

The question of ratification is one of fact. *G & R Corp. v. American Sec. & Trust Co.,* 523 F.2d 1164, 1171 (D.C.Cir.1975). Therefore, the District Court properly submitted the question to the jury. Furthermore, "[i]f fairminded people may differ as to the conclusion, or if there is substantial conflicting evidence, the judgment n.o.v. motion must be denied." *Carter v. Duncan–Huggins, Ltd.,* 727 F.2d 1225, 1227 (D.C.Cir.1984).

> This court has previously noted that [t]he crucial inquiry in determining whether an act was subsequently ratified concerns the *intention* of the party allegedly ratifying the act. Although the intention to ratify can be inferred from the totality of the circumstances in each case, the courts hesitate to find ratification where the facts allegedly showing ratification can be easily explained on other grounds.

*G & R Corp.,* 523 F.2d at 1171 (citations omitted). The District of Columbia Court of Appeals subsequently articulated an even more exacting standard for finding ratification: For an unauthorized act to be ratified, the principal must have knowledge of the act and may ratify the act impliedly, but the conduct which implies ratification must be conduct which is "inconsistent with any other hypothesis." *Lewis v. Washington Metro. Area Transit Auth.,* 463 A.2d 666, 671–72 (D.C.1983). The facts of this case certainly do not compel the conclusion that Kuwait ratified Sensi's deposits into and withdrawals from the 640 Account of funds paid to Kuwait by the Embassy of Kuwait. The facts are susceptible of other interpretations. Consequently, we reject ASB's motion for judgment n.o.v.

E. *Prejudgment Interest*

■ Kuwait maintains that the District Court was required, pursuant to D.C.Code

§ 15–108 (1981) or D.C.Code § 15–109 (1981), to award prejudgment interest. Section 15–108 provides:

> In an action ... to recover a liquidated debt on which interest is payable by contract or by law or usage the judgment for the plaintiff shall include interest on the principal debt from the time when it was due and payable....

The District Court denied prejudgment interest on the grounds that the parties had not contracted for the payment of a stated or easily calculated sum and that the law does not specify the amount of damages to be awarded to a successful litigant of claims like those asserted by Kuwait. *See Kuwait Airways Corp.,* slip op. at 11, *reprinted in* J.A. 85. We conclude that the amount for the breach of contract claim is not liquidated. Thus, Kuwait is entitled to prejudgment interest pursuant to section 15–108 only if this section applies also to conversion claims.

The District of Columbia Court of Appeals has determined that "[d]amages for conversion cannot be regarded as a liquidated debt," *Duggan v. Keto,* 554 A.2d 1126, 1139 (D.C.1989), and, thus, that parties are not entitled to prejudgment interest under section 15–108 for actions in conversion. *See id.* The *Duggan* court also determined that section 15–109 authorizes "post-judgment interest in both tort and contract cases, but pre-judgment interest only in contract cases." *Id.* at 1140. The court concluded that prejudgment interest in tort actions is "neither authorized nor forbidden" by District of Columbia statutes. *Id.* The *Duggan* court, thus, finding no guidance in sections 15–108 or 15–109 for awards of prejudgment interest in tort claims, and looking to case law, held that "pre-judgment interest may be included as part of the damages in an action for conversion to the extent that it will make the injured party whole," *id.,* and it upheld the trial court's award of prejudgment interest as part of its damages for conversion of bonds, *see id.* at 1140–41.[14]

If on remand the District Court is again presented with the question of whether to

---

14. The U.C.C. also does not bar awards of prejudgment interest for conversion claims. *See,*

*e.g., Mohr v. State Bank,* 241 Kan. 42, 734 P.2d 1071, 1083 (1987) (affirming award of prejudg-

award prejudgment interest, it should consider the issue against the standards articulated in *Duggan,* and the cases cited therein. These cases clearly seem to allow for an award of prejudgment interest in conversion cases, "to the extent that it will make the injured party whole."

### F. *Kuwait's Request for a New Trial on Punitive Damages*

Kuwait claims that the District Court erred in dismissing its claim against ASB for punitive damages based on the flagrant or malicious breach of contract, *see Kuwait Airways Corp.,* slip op. at 7–8, *reprinted in* J.A. 81–82, and seeks remand for a new trial on this sole issue. Kuwait contends that it properly pleaded and presented sufficient evidence to warrant submission of the issue of punitive damages to a jury. We conclude that the District Court did not err.

Under District of Columbia law, punitive damages for breach of contract may be assessed " 'in certain, narrowly defined circumstances, where a breach of contract merges with, and assumes the character of, a willful tort, calculated rather than inadvertent, flagrant, and in disregard of obligations of trust.' " *Wagman v. Lee,* 457 A.2d 401, 405 n. 5 (D.C.) (quoting *Brown v. Coates,* 253 F.2d 36, 39 (D.C.Cir.1958)), *cert. denied,* 464 U.S. 849, 104 S.Ct. 158, 78 L.Ed.2d 145 (1983). The District Court determined that:

> KAC's claim for punitive damages based on the flagrant or malicious breach of contract was supported by no evidence. Indeed, the only evidence of the contract was the testimony of former ASB employee, Jerry Parker, and former KAC employee, Hratch Azadian. These witnesses testified only as to the circumstances surrounding the opening of the original KAC account ... not the "640" account. No other evidence concerning the contract claim was offered. Thus,

there was no evidentiary basis upon which to submit the claim for punitive damages to the jury.

*Kuwait Airways Corp.,* slip op. at 7–8, *reprinted in* J.A. 81–82. Aside from referencing a study which showed that ASB lacked corporate documentation in forty-seven percent of the corporate accounts at the branch in question, Kuwait mentions no other evidence in its brief and claims merely that the actions reflect ASB's reckless indifference to the rights of Kuwait and its other customers. On these facts, Kuwait's claim for punitive damages was properly withheld from the jury. *See Brady v. Southern Ry.,* 320 U.S. 476, 479–80, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943) (standards for directed verdict); *see also Wilson v. Good Humor Corp.,* 757 F.2d 1293, 1298 (D.C.Cir.1985) (same).

### CONCLUSION

The discovery rule should not have been applied in the commercial context of this case, where the injury was manifest at the moment of conversion. Consequently we must remand for retrial, barring all claims on checks deposited or cashed more than three years prior to the date Kuwait filed its complaint and barring the breach of contract claim for opening the 640 Account. In addition, should the issue of prejudgment interest arise again, the District Court should evaluate Kuwait's claim in light of the District of Columbia Court of Appeals' recent decision in *Duggan v. Keto,* 554 A.2d 1126 (D.C.1989). With respect to the other claims, we affirm the determinations of the District Court and deny the parties' requests for relief.

*So ordered.*

### ORDER

Upon consideration of the Petition for Rehearing filed by Appellant and Cross-Appellee, Kuwait Airways Corporation, claiming that KAC's claim for punitive damages

---

ment interest where bank permitted corporate officer to indorse checks and deposit proceeds in personal account); *Landmark Bank v. Hegeman–Harris Co., Inc.,* 522 So.2d 1051, 1053 & n. 3 (Fla.Dist.Ct.App.1988) (affirming award of prejudgment interest against bank that deposited check on improper indorsement, stating that

"UCC does not prohibit or limit an award of prejudgment interest"); *see also Bullitt County Bank v. Publishers Printing Co.,* 684 S.W.2d 289, 294 (Ky.Ct.App.1984); *First Bank & Trust Co. v. Insurance Serv. Ass'n Inc.,* 154 Ga.App. 697, 269 S.E.2d 527, 530 (Ga.Ct.App.1980).

based on conversion should have been submitted to the jury, it is

ORDERED that this question should be reconsidered by the trial court along with the other issues that have been remanded in this case, *see supra,* p. 456. If there is a retrial of this case, we leave it to the District Court in the first instance to determine whether, on any claim of conversion, there is sufficient evidence to submit a question of punitive damages to the jury. *See Parker v. Stein,* 557 A.2d 1319, 1322 (D.C.1989); *Mason v. Rostad,* 476 A.2d 662, 667 (D.C.1984).